```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
JOHN SEPA,

                    Plaintiff,              15-cv-7209 (JGK)

             - v.-                           MEMORANDUM OPINION
                                             AND ORDER
CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

                    Defendant.
-------------------------------------- X
```
**JOHN G. KOELTL, District Judge:**

The plaintiff, John Sepa, brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying the plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act ("SSA"). The parties have filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The plaintiff seeks reversal of the decision of the Commissioner and remand to the administrative agency for the calculation of benefits or, in the alternative, remand for a new hearing. The Commissioner seeks to have this case dismissed.

For the reasons explained below, the plaintiff's motion for judgment on the pleadings is **granted** and the defendant's cross-motion is **denied**.

I.

Sepa filed his DIB application on January 20, 2010, alleging disability beginning June 10, 2009 because of severe asthma, back pain, sleep apnea, and post-traumatic stress disorder ("PTSD"). Administrative Record ("R.") 296-99, 325. That application was initially denied. R. 185-87. Pursuant to Sepa's request, an Administrative Law Judge ("ALJ") held a hearing on August 24, 2011 to determine his eligibility for benefits. R. 61-112, 191. In a January 5, 2012 decision, the ALJ determined that the plaintiff was not disabled under the SSA. R. 164-177. Sepa appealed the ALJ's decision and, on July 7, 2013, the Appeals Council vacated and remanded the decision to the ALJ. R. 178-82. Among other errors, the Appeals Council found that the ALJ's decision did not contain an adequate evaluation of the medical source opinions of Dr. Lisa Orsini, who conducted a consultative psychiatric evaluation, and of Dr. J. Belsky, who completed a psychiatric review technique form.

On remand, after a hearing on January 29, 2014, the ALJ found that the plaintiff had several severe impairments, including "asthma/moderate reactive airway disease, sleep apnea, obesity, post-traumatic stress disorder [PTSD], and degenerative changes of the lumbar spine." R. 18. The ALJ concluded that those impairments did not "meet the criteria of any listed impairments" in 20 C.F.R. §§ 404.1520(d), 404.1525, and

404.1526. R. 19. The ALJ then found that the plaintiff had the residual functional capacity ("RFC") to perform "sedentary work" as defined in 20 C.F.R. § 404.1567(a), including "lifting up to five pounds occasionally and ten pounds frequently; sitting up to 6 hours and standing/walking up to 2 hours each in a normal 8-hour workday; and no exposure to concentrated respiratory irritants, temperature extremes, hazardous duties, or frequent public interaction." R. 20. The ALJ determined that the plaintiff could not perform his past relevant work as a firefighter, but, after considering the testimony of a vocational expert, concluded that there were jobs in the national economy that the plaintiff could perform. R. 25-27.

Accordingly, the ALJ denied the plaintiff's DIB application on April 2, 2014. R. 13-31. On July 14, 2015, the Appeals Council denied the plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. R. 1-7. This timely appeal followed.

## II.

The administrative record contains the following facts.

The plaintiff was born on August 9, 1962, has a high school education, attended Lehman College for two years, and graduated from the firefighting academy. R. 36-37, 65-67. Sepa was last employed as a firefighter for the Fire Department of the City of New York ("FDNY"), where he worked until May 2004, when he was

3

forced to retire because of a pulmonary impairment. R. 71, 76. While employed as a firefighter, Sepa also held intermittent employment as a painter and softball umpire. R. 42, 44. The plaintiff lives with his wife and three children, and his daily activities include bathing, watching television, reading the newspaper, going to counseling and doctor's appointments, and assisting his elderly mother. R. 64, 334. He also does light cooking, helps fold clothes, and performs light cleaning. R. 336.

Sepa was a first responder to the September 11, 2001 terrorist attacks at the World Trade Center and spent five months conducting search and rescue operations at ground zero. R. 104. Sepa reported that thirty or forty firefighters from his firehouse died on and in the days after September 11, and that for several months he was "either working or [] going to a funeral." R. 104, 139. The plaintiff testified that while conducting search and rescue operations he found "bits and pieces" of human corpses. R. 139-40.

In early 2003, the plaintiff pulled his back and groin while working at a fire and went to the Jacobi Medical Center emergency room. R. 75. After diagnosing the plaintiff's groin and back injuries, the doctor asked if he had any other symptoms to which he replied that he could not catch his breath. Id. The doctor prescribed a nebulizer for the plaintiff. Id. The next

4

day the plaintiff went to the FDNY medical office to report the emergency room visit. Id. Individuals in the medical office tested Sepa's breathing using a pulmonary function test, which the plaintiff failed. Id. The plaintiff was then put on medical leave as a result of the injuries to his back and groin and because of his breathing impairment. Id. After taking medication, Sepa underwent another pulmonary function test, which he also failed. Id. The plaintiff then failed a methacholine challenge on March 31, 2003, and as a result, was told that he had to retire. R. 76-77, 419. When Sepa returned from medical leave, the FDNY placed him on light-duty work pending his retirement, which entailed scheduling, filing, answering phones, and delivering inter-firehouse mail. R. 38-42, 76-77. The plaintiff retired on May 28, 2004. R. 71, 426.

After retiring, Sepa worked briefly as a real estate broker, but was forced to stop because he was unable to climb stairs and some properties had animals and smells that aggravated his breathing difficulties. R. 70.

**A.**

A review of the plaintiff's medical records reveals the following facts.

Beginning in March 2003, the plaintiff reported regularly to Dr. Michael Weiden for treatment of asthma resulting from dust exposure and smoke at the World Trade Center. R. 415, 482.

5

Dr. Weiden submitted his findings to the Social Security Administration in a medical source statement signed April 16, 2009, which concluded that Sepa could never lift or carry any amount of weight; could sit, stand, or walk for two hours at one time without interruption for a total of up to three hours each in an eight-hour work day; could never climb, stoop, or crawl; could not tolerate exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, or extreme cold or heat; and could only occasionally tolerate unprotected heights, moving mechanical parts, and operating a motor vehicle. R. 483-87. Dr. Weiden further opined that Sepa had "significant" asthma that made him "unemployable due to the need for frequent medical leave." R. 487. Dr. Weiden related his assessment back to May 2004. R. 488.

In a November 18, 2009 letter, Dr. Weiden reiterated his conclusion that Sepa was unable to work because his asthma required him to take frequent medical leave, and opined that the plaintiff's disability was total and permanent. R. 482.

Dr. Weiden submitted another medical source statement in March 2010 to the State disability agency. R. 415-23. Dr. Weiden advised that he had been treating the plaintiff every two months beginning in March 2003. R. 415. The report included a diagnosis of asthma with symptoms of cough, dyspnea, and irritant sensitivity, and a "guarded" prognosis. R. 415-16. It also

6

reflected that Dr. Weiden had prescribed Xopenex and Pumicort. R. 416. The report noted a failed methocholine challenge test, wheezing in 2003, and episodic asthma attacks. R. 417-18. Dr. Weiden also noted behavior characterized by PTSD and depression. R. 416. Dr. Weiden opined that Sepa could lift and carry "frequently" but did not specify a weight; could stand or walk for less than two hours in a work day; and could sit for less than 6 hours in a work day. R. 420.

On April 15, 2010, Dr. Barbara Akresh conducted a consultative examination of Sepa in connection with his DIB claim. R. 432. Dr. Akresh noted Sepa's medical history, including asthma and abnormal pulmonary function tests, exposure on September 11, 2001, allergies, PTSD, anxiety, sleep apnea, a back injury, and hypertension. R. 435-36. Dr. Akresh reported moderate limitations on the plaintiff's ability to perform strenuous activities and mild limitations on his ability to carry and lift very heavy objects. R. 436.

Sepa began visiting Dr. Paul Schulster for respiratory issues in April 2008. R. 389-92. After testing the plaintiff's pulmonary function, Dr. Schulster diagnosed the plaintiff with asthma and prescribed him Xopenex. R. 392-93. Dr. Schulster also diagnosed plaintiff's various allergies, including to grass, cats, and dust, and began administering allergy injections to the plaintiff. R. 397-98, 405.

In a letter dated May 17, 2011, Dr. Schulster reported that Sepa had reactive airway disease and asthma. R. 491. The letter included test results from pulmonary functions tests performed throughout 2010 and 2011, which showed some gradual improvement. R. 492-497. Nevertheless, Dr. Schulster opined that Sepa's "severe pulmonary condition precludes the performance of any work" and that the plaintiff's condition worsened with any exertion, temperature or humidity changes, dust, fumes, chemicals, perfume, animals, stress, or many other precipitating factors. R. 491. Dr. Schulster reiterated that the plaintiff "[c]learly . . . would not be capable of performing any job requiring him to be on his feet for much of the day, lift more than a few pounds, [or] to work outside or near any dust or caustic chemicals." Id.

**B.**

In March 2009, Sepa began attending a support group for retired firefighters who were forced to retire after less than twenty years with the FDNY. R. 481. The social worker who led the group referred Sepa to psychologist Dr. Paul Greene. R. 89.

Sepa began visiting Dr. Greene in June 2009. See R. 511-76. Sepa discussed a variety of topics with Dr. Greene, including his forced retirement, his physical health, his temper and anxiety, the traumatic experience of responding to the World Trade Center disaster, and family issues. See id.

On February 25, 2010, Dr. Greene submitted a report to the State disability agency. R. 406-12. Dr. Greene reported a diagnosis of PTSD and described Sepa's symptoms as "recurrent, intrusive, distressing memories triggered by relevant but common stimuli and [a] tendency to avoid those situations and objects, and conversations"; "physiological and psychological distress related to [the World Trade Center disaster]"; and "irritability with his wife and children." R. 406. Dr. Greene noted that, despite continued treatment, the plaintiff's symptoms continued, and concluded that Sepa "is not expected to return to his previous level of functioning." R. 407. Dr. Greene further opined that the plaintiff "is not capable of performing adequately as a firefighter" and "is not able to work." R. 410. Finally, Dr. Greene reported that the plaintiff's ability to adapt remains limited. R. 411.

On April 15, 2010, Dr. Lisa Orsini conducted a consultative psychiatric examination of the plaintiff. R. 426. Dr. Orsini reported that Sepa can follow and understand simple directions, maintain attention and concentration, and learn new tasks in a structured environment with encouragement, but has difficultly performing simple or complex tasks independently, maintaining a schedule, making decisions, relating to others, and coping with stress. R. 426, 429-30. Dr. Orsini reported a diagnosis of major depressive disorder and PTSD, and concluded

9

that the plaintiff's prognosis was "guarded" in view of the "acute nature" of the plaintiff's symptoms. R. 430. Dr. Orsini concluded that Sepa's psychiatric problems "may significantly interfere with [his] ability to function on a daily basis." Id.

On May 24, 2010, Dr. J. Belsky, a state medical consultant, conducted a review of the plaintiff's file. R. 445-58. Dr. Belsky reported a "medically determinable impairment" of depression and some symptoms of PTSD. R. 448, 450. Dr. Belsky concluded that the plaintiff suffered from mild functional limitations on his ability to perform activities of daily living, and moderate limitations on maintaining social function, concentration, persistence, or pace. R. 455.

### III.

A court may set aside a Commissioner's determination only if it is based on legal error or is not supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (citations omitted). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted); see also Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir.

1995); Moreira v. Colvin, No. 13-cv-4850 (JGK), 2014 WL 4634296, at *3 (S.D.N.Y. Sept. 15, 2014).

A claimant seeking DIB is considered disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2015); see also Moreira, 2014 WL 4634296, at *4.[1]

The Commissioner's regulations define the analytical framework for evaluating disability claims and set forth a five-step inquiry. See 20 C.F.R. § 404.1520. The Court of Appeals for the Second Circuit has described the five-step process as follows:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

---

[1] The definition of "disability" for purposes of eligibility for DIB and Supplemental Security Income ("SSI") benefits is virtually identical, as is the standard for judicial review. Therefore, cases discussing relevant issues for determining SSI benefits are instructive for determining DIB benefits. See Burton-Mann v. Colvin, No. 15-CV-7392 (JGK), 2016 WL 4367973, at *3 n.5 (S.D.N.Y. Aug. 13, 2016) (citing Hankerson v. Harris, 636 F.2d 893, 895 n.2 (2d Cir. 1980)).

    3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

    4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

    5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). The claimant must first establish a disability under the SSA by meeting the claimant's burden of proof under the first four steps of the framework. See Melville, 198 F.3d at 51; Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008). If the claimant satisfies that burden, the Commissioner must establish under the fifth step that, given the claimant's RFC, the claimant could "perform alternative substantial gainful work which exists in the national economy." See Melville, 198 F.3d at 51 (internal quotation marks and citation omitted). If the Commissioner does not satisfy its burden, the claimant is entitled to DIB. See

id.; see also Bushansky v. Comm'r of Soc. Sec., No. 13-cv-2574 (JGK), 2014 WL 4746092, at *5 (S.D.N.Y. Sept. 24, 2014).

**IV.**

The plaintiff claims the ALJ committed legal error by failing to give proper weight to the opinions of Sepa's treating psychologist, Dr. Greene, regarding the plaintiff's psychiatric limitations.

The Commissioner's regulations require that greater weight be given to the opinion of a treating source than that of a non-treating source. See Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993). The regulations state, in pertinent part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . . [A] treating source's opinion on the . . . nature and severity of [the] impairment(s) [that] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . . not inconsistent with the other substantial evidence . . . will [be given] controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various] factors . . . in determining the weight to give the opinion. We will always give good reasons . . . for the weight [given to the] treating source's opinion.

13

20 C.F.R. § 404.1527(c)(2). The factors used to determine the weight accorded to a treating source's opinion when it is not given controlling weight include:

> (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion, i.e. "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; if it is, it will be accorded greater weight; and (v) other relevant but unspecified factors.

Schisler, 3 F.3d at 567.

Here, the ALJ did not give controlling weight to the opinions of Sepa's treating source and failed to give good reasons for the weight it did assign. The ALJ concluded that Dr. Greene indicated in his February 25, 2010 report that Sepa had "no functional limitations due to PTSD, except for some limitation in adaptation due to hazardous conditions." R. 24.[2] That conclusion ignored Dr. Greene's assertion in the same report that Sepa is "not expected to return to his previous level of functioning," that treatment had "not removed the symptoms" of PTSD, that the plaintiff cannot perform a firefighter's tasks, and is "not able to work." R. 407, 410. The ALJ assigned no weight to these statements because "the issue of

---

[2] The ALJ misspelled Dr. Greene's name throughout the decision as "Dr. Green."

14

disability is an issue reserved to the Commissioner." R. 24. That explanation is insufficient. Although it is true that the ultimate determination of disability is reserved for the Commissioner, 20 C.F.R. § 404.1527(d)(1), Dr. Greene plainly conveyed functional limitations by stating that Sepa could not perform the functions of a firefighter and was otherwise unable to work.[3] If the ALJ considered this language ambiguous, the ALJ should have contacted Dr. Greene to clarify Dr. Greene's opinion, because the ALJ has "an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998); see also Scott v. Astrue, No. 09-cv-3999, 2010 WL 2736879, at *15 (E.D.N.Y. July 9, 2010) ("By foregoing the opportunity to inquire further upon [the treating physician's] 2008 wellness report to clarify the admittedly ambiguous opinion and by rejecting [the treating physician's]

---

[3] Similarly, the ALJ erred in determining that the opinion of Dr. Orsini regarding the plaintiff's functional limitations was entitled to "little weight" because it was inconsistent with Dr. Greene's findings, which the ALJ characterized as having found "no specific functional limitation." R. 24. Although the ALJ is not required to give "good reasons" for discounting the opinion of a non-treating source, the conclusion that Dr. Orsini's opinion was entitled to little weight was based on the erroneous view that it was in conflict with Dr. Greene's opinion. See 20 C.F.R. § 404.1527(c)(4) (ALJ will, among other things, consider whether a medical opinion is consistent with the record as a whole in determining what weight to assign that opinion).

15

opinion without fully developing the factual record, the ALJ committed legal error.").

The ALJ also found that Dr. Greene "indicated that the [plaintiff] would be unable to perform the full duties of a firefighter, but didn't opine that the [plaintiff] was prevented from engaging in all work activities." R. 24. This finding is clearly erroneous. First, Dr. Greene's conclusion that the plaintiff is unable to perform as a firefighter does not imply that he is capable of performing other work. Second, Dr. Greene did in fact state that "it is [his] professional opinion that Sepa is not able to work." R. 410. Furthermore, Dr. Greene reasserted his position in a subsequent report dated August 9, 2011, stating that the plaintiff's disability "make[s] it impossible for him to be employed." R. 500.[4] Dr. Greene based his conclusion on the finding that the events of September 11 "are triggered daily and cause anxiety and depression." Id. By failing to afford any weight to certain of Dr. Greene's findings

---

[4] The Commissioner argues that this letter was submitted after the plaintiff's date last insured and is therefore irrelevant. However, the ALJ did consider this report, although the ALJ only described it as reporting "anger and anxiety for risk." R. 24. In any event, subsequent evidence can be considered if it relates to the plaintiff's condition during the period at issue. See Reyes v. Barnhart, 226 F. Supp. 2d 523, 530 (S.D.N.Y. 2002); Lane v. Apfel, No. 98 civ. 2068, 2000 WL 1118921, at *9 (S.D.N.Y. Aug. 8, 2000). There is no evidence in the record that the plaintiff's condition worsened between December 31, 2010, the date last insured, and the date the letter was written in August 2011, that would render the information immaterial.

and by failing to provide "good reasons" for the weight assigned, the ALJ committed legal error.

"In deciding whether a remand is the proper remedy, [the Court of Appeals has] stated that where the administrative record contained gaps," or where "further findings would so plainly help to assure the proper disposition of [the] claim," remand is appropriate. Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004) (internal quotation marks omitted). Because "a more complete record might support the Commissioner's decision," remand solely for a calculation of benefits is inappropriate in this case. Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999). On remand, it will be important to determine the specific factual bases for Dr. Greene's conclusions, and to provide good reasons if those opinions are not accepted.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit.

For the reasons explained above, the plaintiff's motion for judgment on the pleadings is **granted**, and the defendant's cross-motion is **denied**. The Commissioner's decision is **vacated** and the case is **remanded** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion. The Clerk is directed to enter

17

judgment and to close this case. The Clerk is also directed to close all open motions.

**SO ORDERED.**

**Dated:    New York, New York
           December 23, 2016**                  _____/s/_____
                                                        **John G. Koeltl
                                                United States District Judge**